IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

YES ON TERM LIMITS, INC., et al.,       )
                                        )
                    Plaintiffs,         )
                                        )
v.                                      )       No. CIV-07-680-L
                                        )
M. SUSAN SAVAGE, individually and       )
in her official capacity as Oklahoma    )
Secretary of State, et al.,             )
                                        )
                    Defendants.         )

# MEMORANDUM OPINION

In this action, plaintiffs challenge the constitutionality of Oklahoma's residency requirement for initiative petition circulators. Plaintiff Yes on Term Limits, Inc. ("YOTL") is an Oklahoma corporation that seeks to place on the ballot a constitutional amendment setting term limits for certain state-wide offices.[1] Complaint at ¶¶ 7-8; Reporter's Transcript of Proceedings had on August 20-21, 2007 at 148 [hereinafter cited as "Tr."]. Specifically, the proposed initiative seeks to limit persons serving in the offices of the Oklahoma Attorney General, Lieutenant Governor, State Treasurer, State Auditor and Inspector, Superintendent of Public Instruction, and Commissioner of Labor to two terms in office. Plaintiffs' Exhibit 1 at

---

[1]YOTL was incorporated on June 13, 2007, the day before this action was filed. Defendants' Exhibit 1 at 2. In its Certificate of Incorporation, YOTL states that it was formed for the purposes of "encouraging greater civic participation among Oklahoma citizens by promoting limits on the terms of elected officials and other reforms, and the advocating for measures that promote clean, ethical, (sic) state government." Id. at 3.

1 [hereinafter referred to as Initiative Petition 386].[2]  Plaintiff Robert Murphy is an Oklahoma resident who serves as a vice-president of YOTL.  Plaintiffs Sherri Ferrell and Eric Dondero Rittberg[3] are professional  petitioner circulators who are not residents of the State of Oklahoma.  Complaint at ¶ 11.  Ferrell resides in Florida, while Rittberg makes his home in Texas.  Id.; Tr. 7, 97.

On June 14, 2007, plaintiffs filed suit against M. Susan Savage, individually and in her official capacity as Oklahoma Secretary of State, and W.A. Drew Edmondson, individually and in his official capacity as Oklahoma Attorney General. On June 18, 2007, plaintiffs filed a motion for a preliminary injunction.  After the parties completed briefing the matter, the court held an evidentiary hearing on August 20-21, 2007.  At the conclusion of the hearing, the parties stipulated that they had no objection to consolidating the hearing with trial on the merits pursuant to Fed. R. Civ. P. 65(a)(2).  The court has considered the testimony presented at trial, the parties' preliminary injunction and trial briefs, the parties' proposed findings of fact and conclusions of law, and the arguments of counsel.  In accordance with Fed. R. Civ. P. 52(a), this memorandum opinion constitutes the court's findings of fact and conclusions of law.

---

[2]The record is not clear whether Yes on Term Limits, the proponent of Initiative Petition 386, is the same entity as the corporate plaintiff in this case.  See Tr. at 174-76. Plaintiff Robert Murphy, a vice-president of YOTL, could not explain the discrepancies in names and addresses shown on Defendants' Exhibits 1, 26, and 27.

[3]The Complaint as filed refers to Rittberg as Eric Dondero.  At the conclusion of the evidentiary hearing, the court granted plaintiffs' motion to amend the style of the case to reflect Rittberg's full name:  Eric Dondero Rittberg.

Since statehood, the Oklahoma Constitution has preserved to the people of Oklahoma the power to "to propose laws and amendments to the Constitution and to enact or reject the same at the polls independent of the Legislature" through the initiative and referendum process.[4]  Okla. Const. art. 5, §§ 1, 2.  Prior to 1969, Oklahoma imposed no qualifications on petition circulators. Oklahomans for Modern Alcoholic Beverage Controls, Inc. v. Shelton, 501 P.2d 1089, 1092 (Okla. 1972). Beginning that year, Oklahoma law prescribed that petition circulators be qualified electors of the State of Oklahoma and imposed criminal liability on persons other than qualified electors who circulated petitions.  34 O.S. § 3.1.[5]  Article 3, section 1 of the Oklahoma Constitution defines qualified electors as "as citizens of the United States, over the age of eighteen (18) years, who are bona fide residents of this

---

[4]To date, Oklahomans have submitted 736 state questions, including 386 initiative petitions. See Plaintiffs' Exhibit 1 at 4 (designating YOTL petition as State Question Number 736 and Initiative Petition Number 386); 34 O.S. § 7 (requiring each "order for a direct ballot by the voters . . . be numbered consecutively, each in a series by itself, beginning with one, to be continued year after year, without duplication of numbers.").

[5]Section 3.1 provides:

> It shall be unlawful for any person other than a qualified elector of the State of Oklahoma to circulate any initiative or referendum petition to amend, add to, delete, strike or otherwise change in any way the Constitution or laws of the State of Oklahoma, or of any subdivision of the State of Oklahoma . . . .  Every person convicted of a violation of this section shall be punished by a fine of not to exceed One Thousand Dollars ($1,000.00), or by imprisonment in the county jail for not to exceed one (1) year, or by both said fine and imprisonment.

34 O.S. § 3.1.

state". Furthermore, Oklahoma law requires that each circulator verify on each signature sheet that he or she is a qualified elector.[6]

To place an initiative petition on the ballot in Oklahoma, a proponent must gather sufficient signatures within 90 days after the petition is filed with the Secretary of State's office. Tr. at 433-34. The State Election Board Secretary certifies the number of signatures that must be obtained. Id. at 434. An initiative that seeks to amend Oklahoma's Constitution requires signatures equal to 15 percent of the highest number of votes cast at the last general election for the state office receiving the highest number of votes. Okla. Const. art. 5, § 2. Once signatures are collected, the proponent delivers the signature sheets to the Secretary of State's office, where they are then secured until a representative of the proponent can be present to witness the counting of signatures. 34 O.S. § 4; Tr. at 434-35. The Secretary of State is required to count all signatures except:

> 1. All signatures on any sheet of any petition which is not verified by the person who circulated the sheet of the petition as provided in Section 6 of this title;

---

[6]The statute requires a signature sheet be verified in the following manner:

> I, _____, being first duly sworn, say: That I am a qualified elector of the State of Oklahoma and that (Here shall be legibly written or typewritten the names of the signers of the sheet), signed this sheet of the foregoing petition, and each of them signed his name thereto in my presence; I believe that each has stated his name, post office address, and residence correctly, and that each signer is a legal voter of the State of Oklahoma . . . .

34 O.S. § 6. The verification sheet must also contain the signature and post office address of the circulator and must be notarized. Id.

4

2.  All signatures of nonresidents;

3.  All signatures on a sheet that is not attached to a copy of the petition;

4.  All multiple signatures on any printed signature line;

5.  All signatures not on a printed signature line;

6.  Those signatures by a person who signs with any name other than his own or signs more than once; and

7.  All signatures on any sheet on which a notary has failed to sign, the seal of the notary is absent, the commission of the notary has expired or the expiration date is not on the signature sheet.

34 O.S. § 6.1.  The Secretary of State confirmed that, pursuant to this section, her office does not count signatures that are attested to by a non-resident circulator.  Tr. at 468.  *See also* In re Initiative Petition No. 365, 55 P.3d 1048, 1050 (Okla. 2002) (disqualifying signatures collected by person who was not a qualified elector).

Once the signature count is complete, the Secretary of State certifies to the Oklahoma Supreme Court the number of signatures counted and the total number of votes cast for the state office receiving the highest number of votes cast at the last general election.   The Secretary of State does not ascertain whether petition signatories are registered voters, nor does she determine the numerical sufficiency or insufficiency of the signatures counted.  Tr. at 445.  That determination is made by the Oklahoma Supreme Court.  34 O.S. § 8(C).  Oklahoma law also preserves the

right of any citizen of the state to protest a petition or to object to the Secretary's signature count by filing a written notice with the Oklahoma Supreme Court.  Id.

On August 16, 2007, YOTL filed Initiative Petition No. 386 seeking to limit the terms of office of the Oklahoma Lieutenant Governor, State Auditor and Inspector, Attorney General, State Treasurer, Commissioner of Labor, and Superintendent of Public Instruction.  Plaintiffs' Exhibit 1.  Because the petition seeks to amend Article 6, § 4 of the Oklahoma Constitution,  its proponents must gather 138,970 signatures within the 90-day period which began on August 16, 2007.  Id. at 5.  YOTL and Murphy wish to hire professional petition circulators to help them with the signature gathering process.  They contend there are not sufficient professional circulators who are also Oklahoma residents.   Therefore, they want to hire non-resident circulators, including plaintiffs Rittberg and Ferrell, both of whom testified they would circulate petitions in Oklahoma were it not for residency requirement.[7]  Tr. at 15, 107.

---

[7]Notwithstanding the residency requirement that has been on the books since 1969, Rittberg circulated a petition in Oklahoma in 1993 or 1994; he testified he personally gathered signatures in Oklahoma and signed the circulator affidavit.  Tr. at 75-77.  That Rittberg understood the consequences of this is apparent from the following colloquy:

> Q. Are you –  Are you aware that you're required to sign an affidavit, by Oklahoma law, saying you're a resident when you turn your petitions in?
>
> A.  Yeah, I am aware, and, you know, once again, if I would be violating the law I wouldn't sign the affidavit, and –
>
> Q.  Are you aware that you could possibly be prosecuted if you falsified that affidavit?
>
> A. Oh yes.  Absolutely.  That's pretty much par for the course in this business for just about every – everything falsificate – that's falsified.

Plaintiffs contend the residency requirement violates their First Amendment rights to engage in political association and to speak on matters of public concern. Complaint at ¶¶ 49-50.  In addition, they contend the residency requirement violates Rittberg's and Ferrell's rights under the Privileges and Immunities Clause to engage in political speech and to practice their chosen profession in Oklahoma. Id. at ¶ 57. Finally, they argue Oklahoma's ban on non-resident circulators violates the dormant Commerce Clause because it reserves "the trade of gathering signatures for pay to Oklahoma residents alone." Id. at ¶ 71.  They seek declaratory judgment that the residency requirement is unconstitutional and an injunction barring enforcement of that requirement.

Before the court can rule on the merits of plaintiffs' case, it must determine whether plaintiffs have standing to bring this action.  Plaintiffs bear the burden of proof on this issue.  Bronson v. Swensen, ___ F.3d ___, 2007 W.L. 2430124 at *5 (10th Cir. Aug. 29, 2007).  Article III standing requires

> (1) that the plaintiff "suffered an 'injury in fact' – an invasion of a legally protected interest which is (a) concrete and particularized and (b) 'actual or imminent, not conjectural or hypothetical'"; (2) that the injury is "'fairly . . . trace[able] to the challenged action of the defendant and not . . . th[e] result [of] the independent action of some third party not before the court'"; and (3) that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'"

---

Tr. at 15.

7

Baca v. King, 92 F.3d 1031, 1035 (10th Cir. 1996) (citations omitted).  In a case with multiple plaintiffs, each plaintiff must have standing to seek each form of redress requested.  Bronson, 2007 W.L. 2430124 at *5.

In this case, plaintiffs challenge both the criminal and civil consequences of the residency requirement.[8]  While the court finds plaintiffs have established the elements of standing sufficient to challenge the civil consequences of the residency requirement, they have not done so with respect to the criminal provisions because they cannot establish injury in fact.[9]  "A plaintiff challenging the 'validity of a criminal statute under which he has not been prosecuted . . . must show a "real and immediate threat" of his future prosecution under that statute to satisfy the injury in fact requirement.'"  Bronson, 2007 W.L. 2430124 at *6 (quoting D.L.S. v. Utah, 374 F.3d 971, 974 (10th Cir. 2004)).  Plaintiffs, however, have presented no evidence that anyone has ever been prosecuted under § 3.1, much less that they have been threatened with such prosecution.  While Rittberg acknowledged that he could be prosecuted if he falsified a circulator affidavit, Tr. at 15, this is different than being

_____

[8]The criminal penalties associated with the residency requirement are contained in 34 O.S. § 3.1, which makes circulation of petitions by non-residents a misdemeanor offense. Disqualification of signatures collected by a non-resident constitutes the civil penalty plaintiffs seek to avoid.

[9]Moreover, with respect to the Secretary of State, plaintiffs cannot establish the remaining standing elements as the Secretary is not charged with enforcing § 3.1.  As the Court noted in Bronson, "[i]t is well-established that when a plaintiff brings a pre-enforcement challenge to the constitutionality of a particular statutory provision, the causation element of standing requires the named defendant to possess authority to enforce the complained-of provision."  Bronson, 2007 W.L. 2430124 at *9.  Moreover, plaintiffs cannot establish the redressability prong with respect to the Secretary because enjoining the Secretary from enforcing § 3.1 "would be a meaningless gesture."  Id. at 11.

8

prosecuted for the status crime of circulating a petition while a non-resident. Moreover, the court finds Rittberg's and Ferrell's alleged fear of prosecution under § 3.1 is not credible given Rittberg's prior campaign in Oklahoma and Ferrell's lack of knowledge of any criminal penalties.  Tr. at 107.  In short, plaintiffs have not sustained their burden of demonstrating they have standing to contest the constitutionality of the criminal penalties associated with Oklahoma's residency requirement for petition circulators.

With respect to the Secretary of State, however, plaintiffs have established standing to contest the civil consequences of the residency requirement.  The fact that signatures collected by non-resident circulators will not be counted is sufficient to establish injury in fact.  This injury is not conjectural or hypothetical and is traceable to the Secretary, who confirmed her office would not count such signatures.[10]  Moreover, this injury is redressable by an order from this court declaring the residency requirement unconstitutional and therefore unenforceable. Defendants' argument that protestants would not be bound by any such order ignores the fact that it is the Oklahoma Supreme Court who determines the merits of any protest and that Court is bound by the Supremacy Clause of the United States Constitution.  U.S. Const. Art. VI; Cooper v. Aaron, 358 U.S. 1, 18-19 (1958).

---

[10]The injury is not, however, traceable to the Attorney General who plays no role in the counting or certification of signatures.  Thus, plaintiffs have no standing to assert a claim against the Attorney General with respect to the civil consequences of the residency requirement.

9

Having found plaintiffs have limited standing, the court turns to the merits of their request for declaratory and injunctive relief.  Plaintiffs seek an order declaring unconstitutional that portion of 34 O.S. § 6 that requires the petition circulator to verify that he or she is a "qualified elector of the Sate of Oklahoma".  Plaintiffs' Findings of Fact and Conclusions of Law at 77 (Doc. No. 38).  In addition, plaintiffs ask the court to enjoin "[t]he Attorney General of Oklahoma and the Secretary of Sates of Oklahoma, together with all of their successors in office, agents, employees, and all other persons acting in concert or in participation with them . . . from enforcing 34 Okla. Stat. §6 or from refusing to count any signature on a petition, pursuant to 34 Okla. Stat. §6.1, because it does not contain a signed and notarized verification that the circulator is a 'qualified elector of the State of Oklahoma.'"  Id.

> According to well-established principles of equity, a plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief.  A plaintiff must demonstrate:  (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.

eBay Inc. v. MercExchange, L.L.C., 126 S. Ct. 1837, 1839 (2006).  Neither declaratory nor Injunctive relief is warranted, however, unless the court finds a constitutional violation has occurred.

The First Amendment to the United States Constitution, which was made applicable to the states pursuant to the Fourteenth Amendment, prohibits the State of Oklahoma from abridging the freedom of speech.  *See* U.S. Const. amend. I, amend. XIV.  Circulation of initiative petitions "is 'core political speech,' because it involves 'interactive communication concerning political change.'" Buckley v. Am. Const. Law Found., Inc., 525 U.S. 182, 186 (1999).  While the State of Oklahoma is entitled to regulate the initiative process,[11]

> [s]trict scrutiny demands state regulations "impos[ing] 'severe burdens' on speech . . . be narrowly tailored to serve a compelling state interest."  Strict scrutiny is applicable "where the government restricts the overall quantum of speech available to the election or voting process. . . .  [It] is employed where the quantum of speech is limited due to restrictions on . . . the available pool of circulators or other supporters of a candidate or initiative, as in *ACLF* and *Meyer*."

Chandler v. City of Arvada, 292 F.3d 1236, 1241-42 (10th Cir. 2002) (citations omitted).  By limiting petition circulators to residents only, Oklahoma has restricted the available pool of circulators, particularly professional circulators.  The court thus finds the residency requirement is subject to strict scrutiny.

Under strict scrutiny analysis, defendants bear the burden of proving that the residency requirement is substantially related to a compelling governmental interest and that it is narrowly tailored to achieve that interest.  Buckley, 525 U.S. 192 n.12.

---

[11]Indeed, the United States Supreme Court has recognized "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  Storer v. Brown, 415 U.S. 724, 730 (1974).

Defendants assert two interests are served by the residency requirement.  They contend that "Oklahoma has a compelling interest in [1] preventing fraud and policing and maintaining the integrity of its initiative and referendum" and "[2] restricting the process of self-government to members of its own political community."  Defendants' Supplemental Trial Brief at 3, 5 (Doc. No. 41).

The court finds that Oklahoma has a compelling interest in protecting and policing both the integrity and the reliability of its initiative process.  *See* Buckley, 525 U.S. at 191 ("States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally."); Chandler, 292 F.3d at 1241.  The integrity of the petition circulators themselves is critical to that process.

> [I]t is evident that the circulator's role in a citizens; initiative is pivotal.  Indeed, the integrity of the initiative and referendum process in many ways hinges on the trustworthiness and veracity of the circulator.  In reviewing the signatures gathered by the circulators, the Secretary has the ability to verify . . . that a signing voter is actually registered and therefore permitted to vote.  In contrast, the Secretary has no way, without engaging in a separate investigation, to verify that a signing voter actually signed the petition.
>
> * * *
>
> In addition to obtaining truthful information from the circulator, the oath is intended to assure that the circulator is impressed with the seriousness of his or her obligation to honesty . . . and to assure that the person taking the oath is clearly identified should questions arise regarding particular signatures.

12

Maine Taxpayers Action Network v. Secretary of State, 795 A.2d 75, 80 (Me. 2002).

At trial, defendants presented overwhelming evidence that calls into question the integrity of plaintiff Rittberg and other non-resident circulators. On July 16, 2006, Rittberg falsely listed a Colorado address as the "**RESIDENCE** at which the circulator resides"[12] on at least three Colorado Affidavits of Circulator submitted to the Colorado Secretary of State. At the time, Rittberg was a resident of the State of Texas and had been so for approximately nine years. In addition to listing a false address, Rittberg affirmed that he was "a resident of Colorado at the time the section of the petition was circulated and signed by the listed electors". Defendants' Exhibit 31-A at 2, 4, 6. Even at trial, Rittberg was not truthful, as the following colloquy demonstrates:

> Q.  Would it be true that any time you signed a circulator affidavit that you've shown your address to be 6 –
>
> A.  Oh yes, –
>
> Q.  – Chuck Wagon –
>
> A.  Absolutely.
>
> Q.  Let me finish, please.
>
> A.  Okay.
>
> Q.  Would it be true that every circulator affidavit that you've ever signed you have indicated on it, during the last ten years, that your residence or your address was 6 Chuck Wagon Court, Angleton, Texas?

---

[12]Defendants' Exhibit 31-A (emphasis in original).

A.  Uhm, that – Sure.  I believe so.

Q.  That's a truthful statement?

A.  Yes.

Tr. at 50-51.  As shown by his use of a Colorado address in 2006, this testimony is false.  Rittberg also failed to comply with Missouri's laws governing initiative petitions by circulating petitions in that state without registering with the Secretary of State.[13] *See* Mo. Rev. Stat. § 116.080; Tr. at 44-45; Defendants' Exhibit 31 (Affidavit of John Stegman at ¶ 3).  The court finds Rittberg's memory lapse regarding Missouri's requirements and whether he complied with them to be overly convenient and not credible.  Furthermore, although Rittberg testified he personally gathered a thousand signatures in Missouri over a seven-day period,[14] he obviously did not execute the Circulator's Affidavit required by Missouri law as the Secretary of State has no record of his having done so.  Affidavit of John Stegman at ¶ 4.  In addition, the court takes judicial notice of decisions by the Montana Eighth Judicial District Court and the Montana Supreme Court regarding a petition drive in which Rittberg participated.  Defendants' Exhibits 17, 18.  The Montana District Court found three defects occurred during the petition gathering process:

> (1) Proponents' out-of-state signature gatherers routinely attested that they personally gathered or assisted in gathering signatures that, in fact, were gathered by other

---

[13]Rittberg circulated petitions in Missouri for seven days in May 2006.  Tr. at 43.

[14]Tr. at 43.

persons outside of their presence and without direct assistance from them; (2) Proponents' out-of-state signature gatherers used false addresses on their certification affidavits; and (3) at least some of these same signature gatherers employed a deceitful "bait and switch" tactic.

Montanans for Justice v. State ex rel. McGrath, 146 P.3d 759, 770 (Mont. 2006).

The Montana Supreme Court affirmed the trial court's conclusion that Rittberg and four other non-resident circulators "executed affidavits submitting signatures that were gathered outside of their presence.  As a result, they could not lawfully attest to the contents of the affidavits."  Id. at 773.  Likewise, the Court found substantial evidence that Rittberg and the other non-resident circulators provided false addresses on their certification affidavits.[15]  Id. at 774.  Finally, and perhaps most troubling, the Montana courts found that Rittberg engaged in  "bait and switch" tactics to induce persons who signed one petition to unknowingly sign two other petitions by representing their signatures on the other petitions constituted copies.  Id. at 775. The Court found the filing of false affidavits by the non-resident circulators constituted more than a technical violation because "it destroys the primary procedural safeguard for ensuring the integrity of the signature gathering process."  Id. at 777.

---

[15]At the time, Montana did not have a residency requirement for petition circulators. Montana has since enacted such a requirement.  See S.B. 96 (Mont. effective May 11, 2007).

Many of the managers and circulators mentioned by name in the Montana action also participated in the TABOR[16] petition drive in Oklahoma in 2005.[17]  As in the Montana petition drive, non-resident circulators listed addresses of Oklahoma motels as their Oklahoma residences.  Defendants' Exhibit 41 at ¶ 14.  The motels, however, did not have residence information for a number of the circulators, since in many instances multiple rooms were booked and paid for by a single individual.  Id. As a result, it was difficult for the TABOR protestants to locate non-resident circulators.  Mary Robertson, an attorney for the protestants, detailed the significant steps she had to take to obtain information about the circulators:

> Protestants (i) served discovery requests upon on (sic) Richard Carpenter, only to be told 45 days later that the names and addresses of the Circulators were on the pamphlets submitted to the Oklahoma Secretary of State; (ii) subpoenaed OIA, which refused to produce documents subject to the subpoena, thereby forcing Protestants to file a Motion to Compel[;] (333) took the depositions of two notaries but had to file a Motion to Compel the Notaries to turn over their logs (over the objection of the Proponent); (iv) served two different sets of subpoenas upon various motels in the State of Oklahoma, only to be told by the majority of such motels that there were no records of Circulators having stayed at their motels; (v) hired two private investigators to attempt to find Jeff Johnson, the Manager of the [TABOR] Petition in Tulsa; (vi) hired a private investigator to locate Circulators through various

---

[16]TABOR is an acronym for Taxpayers Bill of Rights.  In re Initiative Petition No. 379, 155 P.2d 32, 34 (Okla. 2006).

[17]These individuals include Grace Meyer, Robert Colby, Lorianne Horner, and Dan Zukowski.  Mary Edith Baggett, the proposed petition drive coordinator for Initiative Petition 386, testified that she would likely hire individuals involved in the TABOR drive for the present campaign. Tr. at 216-17, 218, 223.

16

computer programs he had access to and to determine if any of the Circulators had ever resided in Oklahoma; (vii) retained an attorney and a private process server in Ludington, Michigan for the purpose of trying to find and depose Susan Johnson of NVO; (viii) retained an attorney and a private process server in Buckley, Washington for the purpose of trying to find and depose Richard Walther, who was shown as having paid for many circulators' motel rooms; (ix) retained an attorney and a private process server in San Jose, California, for the purpose of trying to find and depose Michael Rhodes, an individual who paid for many circulators' motel rooms; and (x) retained an attorney and a private process server and actually flew to Carson City, Nevada to depose a designated representative of NVO (who turned out to be Susan Johnson and Jeff Johnson).

Id. at ¶9.  As a result of the circulators' false addresses and the lack of cooperation during the protest period by the TABOR proponent, the protestants did not have sufficient time to determine if there were other indicia of fraud in the circulation process.  Tr. at 331.  For example, because protestants did not have a correct address for circulator Michael Rhodes, it was impossible to question him to determine if he in fact collected all the signatures on the sheets that bear his signature.[18]  Tr. at

---

[18]On his circulator affidavits, Rhodes listed the address for the Holiday Inn in Norman, Oklahoma as his address. Defendants' Exhibit 15; Defendants' Exhibit 41 at 14(a).  At the Holiday Inn, Rhodes listed a Texas address as his home address. Defendants' Exhibit 41 at ¶ 14(a).  When protestants deposed Susan Johnson of National Voter Outreach, the coordinator of the TABOR petition drive, she confirmed that Rhodes lived in California.  During the TABOR drive, Rhodes allegedly gathered 1628 signatures, with 1248 of these signatures having been gathered during what appears to be, at most, a three-day period.  See Defendants' Exhibit 15 (380 signatures attested to on December 16, 2005 with the remaining signatures attested to on December 18, 2005).  While it appears unlikely that Rhodes could have single-handedly collected such a large number of signatures in such a limited time frame, protestants were not afforded the opportunity to ask him about this discrepancy due to his use of a false address and the proponent's failure to provide a correct address in a timely manner.

17

327-28.  Moreover, the proponent's lack of cooperation and the fact that witnesses were out-of-state greatly increased the costs incurred by the protestants.  Tr. at 364-65.  Based on the evidence protestants were able to marshal, the Oklahoma Supreme Court invalidated the TABOR petition for "illegality and fraud in the signature collection process".  In re Initiative Petition No. 379, 155 P.2d at 34.  The Court specifically found that "[t]he involvement of out-of-state circulators in the signature gathering process establishes a pervasive pattern of wrongdoing and fraud which, combined with the resistance to discovery and continued secrecy surrounding the operation, require TABOR to be stricken in its entirety."  Id. at 36.  Thus, Oklahoma has actual experience that calls into question the integrity of non-resident circulators.

Likewise, Oklahoma's experience highlights the difficulties of policing its initiative process when non-resident circulators are used.  Oklahoma requires that protests to an initiative petition be filed within ten days of the Secretary's publication of apparent sufficiency.  34 O.S. § 8(C).  The Oklahoma Supreme Court is then charged with resolving the protest "with dispatch."  34 O.S. § 8(E).  There is thus little time to locate and depose out-of-state circulators,[19] particularly when – as in TABOR – the circulators give false addresses.  Moreover, there is no ability to compel the presence of out-of-state witnesses at any hearing as the "subpoena powers of

_____

[19]Paid professional circulators, such as Rittberg and Ferrell, travel from state to state to work on petition drives.  Tr. at 182-83, 243.  They typically come into a state a few days before signature gathering begins and leave – at the latest – once the drive is completed.  Tr. at 70.

Oklahoma courts stop at the state line." Blue Tee Corp. v. Payne Well Drilling Inc., 125 P.3d 677, 679 (Okla. App. 2005).

The court finds the residency requirement is sufficiently tailored to meet Oklahoma's compelling state interests in protecting the integrity of its initiative process and policing the process once it has been completed.[20]  Non-resident circulators – including the named plaintiffs in this action – have demonstrated a propensity to flout state laws regulating the petition process.[21]  "[C]irculators are, in effect, entrusted with personal responsibility to prevent irregularities in the petition process";[22] the refusal of non-resident circulators to follow state laws, however, calls into question their ability to do so.[23]  The residency requirement also enhances

---

[20]Contrary to plaintiffs' assertions, this case is not governed by the Tenth Circuit's decision in Chandler, 292 F.3d 1236.  The Court in Chandler took pains to distinguish the municipal residency requirement at issue in that case from a state residency requirement.  Id. at 1244.  The Court in the past has noted that state residency requirements "more precisely" achieve a state's interest in policing the integrity of the petition process.  Am. Const. Law Found., Inc. v. Meyer, 120 F.3d 1092, 1100 (10th Cir. 1997), aff'd sub nom. Buckley v. Am. Const. Law Found., Inc., 525 U.S. 182 (1999).

[21]In addition to the irregularities noted above, the court notes that both Rittberg and Ferrell indicated their intent to circulate state-wide petitions in California this fall notwithstanding California's residency requirement that has been on the books since 2001.  Tr. at 69-70, 118-119; Cal. Elec. Code § 9021.  Plaintiffs' claimed reluctance to circulate petitions in Oklahoma due to its residency requirement is thus belied by their actions in other states.

[22]Meyer, 120 F.3d at 1099.

[23]In addition to the irregularities already noted, the evidence presented demonstrates that Oklahoma's experience with the use of false addresses by non-resident circulators was not an anomaly.  For example, Daniel Hill, who participated in the TABOR drive, also circulated petitions in Missouri and Montana in 2006.  During the TABOR drive, he represented his address to be 3033 Tinker Diagonal, Dell (sic) City, Oklahoma.  Defendants' Exhibit 33.  The court notes that a true resident of Del City, or for that matter the State of Oklahoma, would know the correct spelling of Del City.  Four months later, he affirmed under penalty of perjury that he lived in St. Louis, Missouri.  Id.  Less than two months later while working in Montana, Hill represented his address to be 5353 Midanes Road, Billings, Montana.  Neither Missouri nor Montana had residency requirements for

19

Oklahoma's ability to police the petition process because it increases the likelihood that circulators will be easily located within the short time-frame allotted and only a resident can be subject to compulsory process.  Oklahoma's actual, not speculative, experience with this issue in the TABOR protest establishes that the state is without the power to compel testimony of an unwilling, uncooperative non-resident circulator.  *See* In re Initiative Petition 379, 155 P.3d at 45.  Plaintiffs' proposed alternative to the residency requirement – that circulators agree to return to Oklahoma should a protest arise and if they do not do so the signatures they gathered would be stricken – is unenforceable and disenfranchises Oklahoma voters who have a right to rely on the integrity of the process.  Oklahoma voters who sign initiative petitions in the hope that the measure will attain the ballot have an interest in having their signatures, that is *their* political voice, considered in a meaningful way.  Plaintiffs' alternative pits the fundamental constitutional rights of Oklahoma voters who sign initiative petitions against the rights of non-resident circulators.  Plaintiffs, in effect, ask that a non-resident circulator be granted the power to invalidate voters' signatures by refusing to cooperate in the discovery process associated with a protest.  Moreover, plaintiffs' assertion that the residency requirement limits the likelihood that an initiative will qualify for the ballot is belied by the experience of its own witnesses.  Both Mary

---

circulators in 2006. Grace Meyer, who also participated in the TABOR drive, informed Missouri that she resided in Flint, Michigan as of January 30, 2006. Defendants' Exhibit 36. Nonetheless, when she circulated petition in Montana in May 2006, she represented her address as 5059 North Reserve St., Missoula, Montana. Id.

Edith Baggett, who was contacted by YOTL to coordinate the petition drive for Initiative Petition 386, and Michael Douglas Arno, plaintiffs' expert witness, both have qualified measures in Oklahoma while complying with Oklahoma's residency requirement.  Tr. at 224, 266-270.[24]  While use of resident circulators would increase the cost of the petition drive, there is no indication that the increased cost would be prohibitive and indeed even the increased cost per signature is substantially below the cost in other states.[25]

Having found the residency requirement is narrowly tailored to serve Oklahoma's compelling interest in preserving the integrity of the petition process and policing that process, the court need not address defendants' alternative argument that the requirement also serves Oklahoma's interest in restricting self-governance to members of its political community.  The court finds plaintiffs' First Amendment challenge to the residency requirement fails for the reasons articulated above.

_____

[24]In addition, the court takes judicial notice that since 1969, numerous initiative petitions have qualified for the ballot in Oklahoma.  *See* 34 Okla. Stat. Ann. App.

[25]Baggett testified that the gross cost per signature if she used non-resident professional circulators would be $1.95; this amount includes overhead and is not the amount that would be paid to circulators.  Tr. at 205, 211.  The cost would increase to $2.95 per signature if she complied with Oklahoma's residency requirement. Id. at 205, 210.  The gross cost per signature Baggett has budgeted is substantially below amounts Rittberg and Ferrell testified they have received on other campaigns. Tr. at 12 ("[I]t usually runs the gambit (sic), you know, a dollar, a $1.25, up to $3, 3.50, 4, or $5.  And, of course, California is the big enchilada.  . . . They always pay the most in California."); Tr. at 104 ("You're paid per signature.  I – I've seen petitions pay as little as 34 – 30 or 40 cents.  I think the most I've ever seen paid per signature is about $10 . . . .  [G]enerally speaking, most petitions tend to fall between a dollar and two – and maybe 2.50 per signature.").

This does not end the court's inquiry, however, because plaintiffs have also challenged the requirement as violative of the Privileges and Immunities Clause and the dormant Commerce Clause. The Privileges and Immunities Clause provides that "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the Several States." U.S. Const. art. IV, § 2. The Supreme Court has enunciated a two-part test for determining whether a restriction on non-residents constitutes a violation of the Privileges and Immunities Clause. Nelson v. Geringer, 295 F.3d 1082, 1089 (10th Cir. 2002).

> [T]he first prong asks whether the activity the state restricts is
>
>> sufficiently basic to the livelihood of the Nation . . . as to fall within the purview of the Privileges and Immunities Clause. For it is only with respect to those "privileges" and "immunities" bearing on the vitality of the Nation as a single entity that a State must accord residents and nonresidents equal treatment.
>
> If the activity in question meets the above test, a second consideration under the first prong is whether the restriction falls within an exception to the Clause for residency requirements that are related to the state's ability to function as a sovereign. The activities that fall within this exception include voting for and holding elective state office, activities that this involve, respectively, the state's ability to exist as a separate political community and the state's ability to function as a sovereign body.

Id. at 1089-90 (citations omitted). Under the second prong, the court examines whether the restriction is "closely related to the advancement of a substantial state

interest."  Supreme Court v. Friedman, 487 U.S. 59, 65 (1988).   Similarly, the dormant Commerce Clause analysis focuses on whether the discriminatory "statute 'serves a legitimate local purpose'" that "could not be served as well by available nondiscriminatory means."[26]  Maine, 477 U.S. at 138.  Given these standards of review, the court's determination in the First Amendment context that the residency requirement is narrowly tailored to serve a compelling state interest controls the outcome of plaintiffs' Privileges and Immunities and dormant Commerce Clause claims.[27]  The court therefore concludes that Oklahoma's residency requirement does not violate either the Privileges and Immunities Clause or the dormant Commerce Clause.

A "fair and honest"[28] election process is central to our system of governance. Defendants presented overwhelming evidence that professional non-resident petition circulators displayed disdain for state laws governing the initiative process, thus

––––––––––––––––––––––

[26]Because Oklahoma's residency requirement affirmatively discriminates against nonresidents who travel in interstate commerce, it is subject to "demanding scrutiny".  Maine v. Taylor, 477 U.S. 131, 138 (1986).

[27]Because plaintiffs' Privileges and Immunities claim fails based on the second prong, the court need not address whether plaintiffs' putative privilege of circulating initiative petitions comes within the state sovereignty exception.  This exception "includes residency requirements that are necessary for the state to operate as a 'separate political community,' such as . . . [activities that] are 'close to the core of the political process.'"  Nelson, 295 F.3d at 1091.  Circulation of petitions is core political speech and amending a state's statutes or constitution is certainly at the core of the political process.  As the Supreme Court noted, "some state functions are so bound up with the operation of the State as a governmental entity as to permit the exclusion from those functions of all persons who have not become part of the process of self-government."  Ambach v. Norwick, 441 U.S. 68, 73-74 (1979).

[28]Storer, 415 U.S. at 730.

calling into question the fairness and honesty of the process.  The drafters of Oklahoma's Constitution preserved to the people of Oklahoma the power to propose laws and constitutional amendments.  The evidence reflected that, by flouting the very method by which the people's legislative power is envisioned to be exercised, the non-resident circulators make a mockery of the initiative petition process.  The court finds Oklahoma's limiting petition circulators to qualified electors is within its power to protect and police the integrity of initiative and referendum.

In sum, this action is DISMISSED as to the Oklahoma Attorney General because plaintiffs did not establish standing with respect to their claims against the Attorney General.  With respect to plaintiffs' remaining claims, the court finds in favor of defendant Secretary of State M. Susan Savage.  As the court has found no constitutional violations, plaintiffs' Motion for Preliminary Injunction (Doc. No. 10) is DENIED.  Judgment will issue accordingly.

It is so ordered this 7th day of September, 2007.

_Tim Leonard_

TIM LEONARD
United States District Judge